[Cite as *In re V.F.*, 2022-Ohio-2960.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE V.F.                                    :
                                              :
A Minor Child                                 :               No. 111388
                                              :
[Appeal by B.T., Mother]                      :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 25, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD21905219

---

### *Appearances:*

Wargo Law, LLC, and Leslie E. Wargo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary LaFleur, Assistant Prosecuting Attorney, *for appellee*.

---

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Appellant–mother B.T. ("Mother") appeals the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"), that terminated her parental rights and granted permanent custody of her minor child V.F. to the appellee, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). The juvenile court found that V.F. could not

or should not be placed with Mother and that awarding permanent custody to the agency was in V.F.'s best interest. Mother contends that these findings were not supported by clear and convincing evidence and that the juvenile court, therefore, erred in granting permanent custody of V.F. to the agency. She argues that she was engaged in substance abuse treatment and V.F. could have been placed with her within a reasonable time. She says the juvenile court should have extended the agency's temporary custody to allow her to complete her substance abuse treatment and she argues that this would have been in V.F.'s best interest. For the reasons that follow, we affirm.

## I.   Factual Background and Procedural History

{¶ 2}   Mother gave birth to V.F. on September 18, 2020.

{¶ 3}   On June 21, 2021, the Cuyahoga County Division of Children and Family Services filed a complaint for neglect and dependency along with a motion for predispositional temporary custody. The complaint alleged that Mother: (1) has mental health issues that affect her ability to provide adequate care for V.F., has been diagnosed with schizophrenia and was at the time committed to a treatment facility for competency restoration in two criminal cases pending in the Cuyahoga County Court of Common Pleas, General Division; (2) tested positive for cocaine and marijuana while pregnant with V.F. and has failed to address her substance abuse issues, specifically with regard to cocaine and marijuana; (3) has failed to support, visit or communicate with V.F. for longer than ninety days and (4) has an older child

who was adjudicated dependent based in part on Mother's mental health issues and committed to the legal custody of the child's father. Cuyahoga J.C. No. AD19914333.

{¶ 4} The complaint further alleged that V.F. had been in the uninterrupted custody of the agency since approximately one day after his birth. The complaint alleged that the agency had filed three previous complaints related to V.F., but those complaints were not resolved within the statutory time limits and had been or would be dismissed. Cuyahoga J.C. Nos. AD20908009, AD20910537 and AD21901997. The complaint also alleged that the agency made reasonable efforts to prevent the removal of V.F. from the home and removal from the home was in V.F.'s best interest.[1]

{¶ 5} The agency supported its motion for predispositional temporary custody with an affidavit from CCDCFS social worker Cherron Phillips. In the affidavit, Phillips attested to the allegations in the complaint. She further averred that "the following reasonable efforts were made" by the agency:

> 1.  The services provided to prevent or eliminate the need for removal of the child from the home prior to placement and the actions that will be taken following placement to make it possible for the child to return home: substance abuse assessment, mental health treatment[.]
>
> 2.  Why these services did not prevent the removal of the child from the home or enable the child to return home: Mother unavailable to care for the child due to her mental health[.]

(Emphasis deleted.)

---

[1] As for V.F.'s father, the complaint alleged that the alleged father had failed to establish paternity and had failed to visit, support or communicate with V.F. since V.F.'s birth.

**A. Hearing on the Motion for Predispositional Temporary Custody**

{¶ 6} On June 22, 2021, the magistrate conducted a hearing on the complaint and motion. Mother did not attend the hearing. At the conclusion of the hearing, the magistrate entered an order committing V.F. to the emergency temporary care and custody of the agency. In its journal entry, the magistrate included the findings that V.F.'s return to Mother's home "will be contrary to the child's best interest," "[the] child would be at immediate risk of harm" and "there is not a suitable relative of the child who is willing to be a temporary custodian * * *." The magistrate also noted that "Mother's whereabouts are unknown. Mother has identified mental health and substance abuse issues that need to be addressed. Child is doing well in current placement." After a trial on September 7, 2021, the magistrate issued a decision finding that the allegations in the complaint had been proven by clear and convincing evidence and adjudicated V.F. to be a neglected and dependent child.

{¶ 7} On September 23, 2021, the juvenile court approved and adopted the magistrate's decision.

**B. The Motion to Modify Temporary Custody to Permanent Custody**

{¶ 8} On September 23, 2021 — the same day that the juvenile court journalized its approval of the magistrate's decision — CCDCFS filed a motion to modify its temporary custody of V.F. to permanent custody. In support of the motion, Cherron Phillips averred, among other things, as follows:

The child was adjudicated neglected and dependent and committed to the temporary custody of CCDCFS in an order journalized September 23, 2021.

A case plan was filed with [the] Juvenile Court and approved which requires that Mother complete a mental health assessment and follow the recommendations; complete a drug and alcohol assessment and follow the recommendations; and provide random drug screens.

Mother has failed to complete a mental health assessment for CCDCFS. Mother is currently incarcerated [as a result of two criminal cases in the Cuyahoga County Court of Common Pleas], under which she was previously court-ordered to in-patient treatment for competency restoration.

Mother has failed to complete a drug and alcohol assessment or provide random drug screens.

Mother has failed to support, visit, or communicate with the child for a period greater than 90 days.

{¶ 9} After several pretrial conferences and continuances, the juvenile court set a trial on the motion for March 16, 2022. Mother's counsel filed a motion to continue the trial on March 10, arguing that the Cuyahoga County Court of Common Pleas, General Division, had recently ordered Mother to complete inpatient drug treatment and as a result she would have difficulty assisting in the preparation of her case. The juvenile court denied the motion on March 11, 2022.

## C. The Trial on the Motion for Permanent Custody

{¶ 10} The trial proceeded as scheduled on March 16, 2022. At the start of the trial, Mother's counsel orally renewed the motion to continue because Mother was not present. Counsel repeated that Mother had entered court-ordered, inpatient drug treatment the preceding week. Counsel reported that Mother was permitted to attend the trial, but he had not heard back from the facility after the

written motion to continue was denied. The juvenile court denied the oral motion. Mother ultimately arrived at the trial during the presentation of the agency's case.

### 1. The Agency's Case

{¶ 11} The agency presented one witness — Cherron Phillips.

{¶ 12} Phillips testified that she is an ongoing social worker for the agency, and she is not a licensed social worker. She said that she has been assigned to Mother's case since October 2020. She reported that paternity has not been established for V.F. and there is no alleged father for V.F.

{¶ 13} Phillips testified that Mother tested positive for cocaine and marijuana while pregnant with V.F. and that Mother has mental health issues that affect her ability to provide adequate care for V.F. She testified that a case plan was developed for Mother that identified substance abuse and mental health as concerns. Phillips said the case plan was reviewed with Mother and Mother expressed that she understood the case plan services. Phillips testified that Mother did not express any objections to the case plan and agreed to work the plan, which had the reunification of V.F. and Mother as its ultimate objective.

{¶ 14} Phillips testified that despite this early agreement to work the case plan, Mother was not very engaged with the agency until a court ordered Mother to undergo a competency evaluation in May 2021.

{¶ 15} Specifically, as it relates to the substance abuse concerns, Phillips testified that Mother was referred to an entity called "the Centers for Children and

Families" ("The Centers")[2] for substance abuse services when V.F. initially came into the agency's custody, and Mother agreed to engage in those services. Phillips said several appointments were made for Mother, and Mother "had several no-shows * * * for those assessments."

{¶ 16} As for the mental health concerns, Phillips testified that Mother did not receive mental health services at this time either.

{¶ 17} Phillips testified that between September 2020 and January 2021, V.F. was staying with a maternal great aunt, so Mother was able to visit as she wanted. Phillips reported visiting the aunt monthly, and she said the aunt told her that — despite the open visitation schedule — Mother would only visit V.F. "sporadically." Phillips said the aunt reported that Mother would also see V.F. when the aunt took V.F. to see his grandmother.

{¶ 18} Phillips testified that the agency moved V.F. from the aunt's residence into foster care in January 2021. Phillips said the agency was not able to reach Mother to establish a new visitation schedule because Mother was being "evasive" with the agency. According to Phillips's testimony, Mother did not visit V.F. between January and May 2021.

{¶ 19} Phillips testified that a court ordered Mother to undergo a competency evaluation at Northcoast Behavioral Healthcare in a criminal case. She said that Mother was at Northcoast from May 2021 until her discharge in September

---

[2] Phillips may have been referring to The Centers for Families and Children.

2021. The agency offered into evidence a certified discharge summary from Northcoast indicating that Mother reported previous diagnoses of schizophrenia and bipolar disorder and providing discharge diagnoses of "Bipolar I Disorder, most recent episode mania with psychosis, currently in full remission" and "Cannabis use disorder, in early remission, in a controlled environment."

{¶ 20} Phillips testified that after Mother's discharge from Northcoast, Mother was supposed to follow up with The Centers in October 2021. Phillips said that Mother missed that appointment but followed back up in November 2021. Phillips stated that Mother had a mental health assessment at The Centers, but Mother decided to attend mental health services through a different entity called Brighter Tomorrow Community Services.

{¶ 21} Phillips testified that Mother also completed a substance use assessment at The Centers in November 2021. Phillips said that Mother admitted that she had relapsed by using cocaine, and then she started outpatient services with The Centers, attending services two days a week. Phillips testified that the agency recommended that Mother also obtain peer support with an entity called "Thrive," but Mother refused to give the agency required information to allow the referral to be completed.

{¶ 22} Phillips reported that the agency also spoke with Mother about her employment situation in November 2021. She said Mother reported that Mother had worked at a temporary agency for a time and then she stopped working there and started working with her father doing construction.

{¶ 23} Phillips testified that Mother was asked to regularly undergo drug screens and after Mother's discharge from Northcoast she would go once weekly, as requested, to submit urine samples. Phillips also said that after her discharge, Mother allowed CCDCFS to do a home visit when the agency requested.

{¶ 24} Phillips testified that after Mother was released from Northcoast, the agency established a visitation schedule for Mother that allowed Mother to visit V.F. once a week for two hours. She said the visitation was set for a time and at a location that were convenient to Mother. Phillips said the agency counseled Mother about the importance of visiting and bonding with V.F. and Mother would respond, "Okay." Phillips testified that Mother only visited V.F. twice after her discharge from Northcoast.

{¶ 25} Phillips described that during the first visit — in October 2021 — there was not much interaction between Mother and V.F., and V.F. clung to the family advocate. Phillips said that Mother called V.F.'s name and changed his diaper. Phillips testified that there was no bond demonstrated between Mother and V.F. at this visit.

{¶ 26} Phillips testified that following this visit, she corresponded with Mother a lot. Mother called the agency a couple times to ask about when visits were set up but she did not ask about how V.F. was doing. Phillips said that most of the time, Mother would not call to confirm her visits and missed many of the scheduled visits. She said there were times where V.F. was brought to the visitation location, but Mother did not show up.

{¶ 27} Phillips said that Mother again visited V.F. in January 2022. She described that during that visit, V.F. stood by Mother, holding on to the couch where Mother was sitting. Phillips said Mother picked him up, called his name and showed him something on her phone. She said Mother left early from the visit to attend a component of her treatment. Phillips testified that there was no bond demonstrated between Mother and V.F. at this visit, either.

{¶ 28} Phillips testified that the agency tried to schedule another visit with Mother for the end of January 2022 but Mother stated that she "was tired."

{¶ 29} Phillips testified that there had been no interaction between the agency and Mother since January 2022. She said CCDCFS had reached out but Mother had not responded back.

{¶ 30} The agency offered into evidence a drug screen that was provided to CCDCFS. Describing the results of the screen, Phillips testified that a urine sample was collected from Mother on February 2, 2022 and the screen was positive for cocaine. Phillips testified that Mother did not successfully complete outpatient substance use services at The Centers due to "disengagement"; specifically, she said Mother stopped attending substance use services at The Centers on February 16, 2022.

{¶ 31} Phillips testified that Mother was still engaged in mental health services as of a week and a half before the trial, before her commitment to an inpatient drug treatment program.

{¶ 32} Phillips testified that substance abuse and mental health concerns remain on Mother's case plan. She said that in her experience and training, the use of illegal substances can negatively affect mental health treatment. She testified that she did not believe that Mother had substantially benefitted from the mental health and substance abuse services offered by the agency. She said that Mother had not remedied the conditions that initially led to the removal of V.F. from the home and that Mother could not provide a safe, stable and permanent home for V.F.

{¶ 33} Phillips testified that she has not discussed employment with Mother more recently than November 2021 because she has not been able to reach Mother since Mother's last visit with V.F.

{¶ 34} Phillips reported that the agency completed a kinship assessment for a maternal aunt and determined that the aunt was not a viable option for V.F., and that Mother has not presented any other relatives to the agency as potential care alternatives.

{¶ 35} Phillips testified that she has visited V.F. in his foster placement and V.F. "is actually doing very well." She said that V.F. appears to be bonded with the foster family including the siblings that are in the foster home. Phillips testified that V.F. appears calm and comfortable and is clingy with the foster mother and the other children. Phillips said she observed V.F. playing on the floor and having books and toys in his hands. Phillips testified that the foster family makes sure that V.F. is medically up to date. She reported that the agency referred V.F. to an entity that could help with his developmental growth and the foster family reached out and was

waiting for an appointment for an assessment. She said there have been no concerns about V.F.'s placement in the foster home.

{¶ 36} Phillips testified that if permanent custody were granted to the agency, she did not anticipate any placement changes in the foreseeable future. Phillips said she believed permanent custody was in the best interest of V.F.

{¶ 37} On cross-examination, Phillips admitted that it is common for people to have relapses when trying to get sober.

{¶ 38} Phillips further admitted that at the time of the trial, Mother was in inpatient treatment for drug addiction, which Phillips said was the most severe type of drug treatment. She testified that Mother was ordered by a court to undergo this inpatient treatment.

{¶ 39} In addition to offering the urine screen, nursing discharge summary, June 21 complaint and September 23 judgment entry into evidence, the agency offered a certified complaint for dependency and legal custody for another of Mother's children — S.P. — as well as a certified journal entry documenting that the juvenile court had granted legal custody of S.P. to S.P.'s father because, among other things, "Mother has not engaged in services[] and has never been consistent in receiving mental health treatment. * * * Mother is unable to care for the child due to her untreated mental health issues." Cuyahoga J.C. No. AD19914333.

## 2. Mother's Case

{¶ 40} Mother did not offer any witnesses or evidence at the trial.

### 3. The Guardian Ad Litem's Report

{¶ 41} V.F.'s guardian ad litem testified that V.F. has "thrived" in his foster home and is "doing wonderfully."  She said that he has not reached some of the developmental milestones, but the foster family has taken steps to ensure that he improves in that regard.  She testified that this case has been continued numerous times to allow Mother to work her case plan services.  She said that visitations had been scheduled and rescheduled at Mother's convenience, and yet the visits remained "sporadic at best."  She testified that she believed it was in V.F.'s best interest to have permanent custody granted to the agency.  She said that V.F.'s foster family was willing to adopt him if he became available.

## D. The Court's Grant of Permanent Custody and Mother's Appeal

{¶ 42} The juvenile court granted permanent custody to the agency, reasoning as follows:

> Based on the testimony and evidence, it's apparent that you [Mother], personally, have some issues that you need to address for you to, one, remain in the community, not in jail, and to treat your substance abuse issues and your mental health issues. * * * Your attorney is asking that I continue temporary custody so that you can hopefully complete your court ordered and Agency required treatment.  I believe — that sounds like if I did it, granted his request, I'd be making my decision based on what's in your best interest and not [V.F.'s].

{¶ 43} The juvenile court journalized its decision on March 21, 2022.  The juvenile court found, by clear and convincing evidence, that V.F. could not be placed with either of his parents or should not be placed with either parent.  Specifically, the juvenile court made the following findings:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the mother and alleged father have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. [R.C. 2151.414(E)(1)]

Mother has a chronic mental illness, a chronic emotional illness, and chemical dependency that is so severe that it makes the parent unable to provide an adequate, permanent home for the child at the present time and, as anticipated, within one (1) year after the [c]ourt holds the hearing in this matter. [R.C. 2151.414(E)(2)]

Mother and alleged father have neglected the child between the date * * * the original complaint was filed and the date of the filing of this motion by the failure to regularly visit, communicate [with], or support the child. [R.C. 2151.414(E)(3)]

Mother and alleged father have demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions, have shown an unwillingness to provide an adequate, permanent home for the child. [R.C. 2151.414(E)(4)]

Mother has had parental rights terminated involuntarily with respect to a sibling of the child. [R.C. 2151.414(E)(11)]

Mother is unwilling to provide food, clothing[,] shelter, and other necessities for the child, or to prevent the child from suffering emotional or mental neglect as evidenced by her unwillingness to successfully complete a case plan so she can provide care for the child. [R.C. 2151.414(E)(14)]

{¶ 44} The juvenile court further found that it was in V.F.'s best interest that permanent custody be granted to the agency. The juvenile court found that the agency had made reasonable efforts to reunify Mother and V.F.

{¶ 45} Mother appealed, raising the following sole assignment of error for review:

The evidence presented to the trial court did not support, by clear and convincing evidence, a finding that permanent custody to the Agency was in the best interests of the child; whereas an extension of temporary custody should have been granted.

## II. Law and Analysis

{¶ 46} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This right is not absolute, though. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 47} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort." *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, approved "when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline,

protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

### A. Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS

{¶ 48} An agency may obtain permanent custody of a child in two ways. *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 44 (8th Dist.), citing *In re E.P.*, 12th Dist. Fayette Nos. CA2009-11-022 and CA2009-11-023, 2010-Ohio-2761, ¶ 22. An agency may first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or an agency may request permanent custody as part of its abuse, neglect or dependency complaint under R.C. 2151.353(A)(4). *Id.* at ¶ 44. In this case, the agency requested temporary custody and then filed a motion for permanent custody.

{¶ 49} Pursuant to R.C. 2151.414, a juvenile court may grant permanent custody of a child to an agency if the juvenile court determines by clear and convincing evidence at a hearing that doing so is in the best interest of the child and that any enumerated prerequisite exists, including — in relevant part — the following:

The child is not abandoned or orphaned,

has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or

has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and

the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(B)(1)(a) (line breaks added for clarity).

{¶ 50} Here, the juvenile court found that V.F. has not been in the temporary custody of CCDCFS for twelve or more months of a consecutive twenty-two-month period. Neither Mother nor the agency challenge that finding as it relates to R.C. 2151.414(B)(1).

### B. Whether V.F. Could Not Be Placed with Mother Within a Reasonable Time or Should Not Be Placed with Mother

{¶ 51} In determining whether a child cannot or should not be placed with one of their parents, a juvenile court must consider "all relevant evidence," including specific factors enumerated in R.C. 2151.414(E). If the juvenile court finds, by clear and convincing evidence, that at least one of these enumerated factors exists as to each of the child's parents, the juvenile court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E).

{¶ 52} Here, the juvenile court found by clear and convincing evidence that numerous enumerated factors in R.C. 2151.414(E) applied — see above at paragraph

43 — and therefore V.F. could not be placed with Mother within a reasonable time or should not be placed with her.

{¶ 53} Mother challenges this finding because the agency filed the operative complaint for temporary custody in June 2021, it filed the motion for permanent custody only three months later in September 2021 and Mother was in a mental health facility for the entire time between the complaint and the motion. Mother also points out that she was engaged in outpatient substance use services from November 2021 to February 2022, and she freely admitted to a relapse without trying to hide it. Mother further states that at the time of the trial, she was in an inpatient drug treatment program. All of these facts, she argues, prohibit a finding by clear and convincing evidence that any of the R.C. 2151.414(E) factors were met.

{¶ 54} "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Cross*, 161 Ohio St. at 477 (emphasis deleted).

{¶ 55} "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.*; *see In re S.B.*, 8th Dist. Cuyahoga Nos. 110016 and 110017, 2021-Ohio-1091, ¶ 22

("In determining whether a juvenile court based its decision on clear and convincing evidence, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the degree of proof."). "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 56} In this case, the record shows that Mother tested positive for cocaine and marijuana while pregnant with V.F. in September 2020, admitted to a relapse on cocaine in November 2021 and then tested positive for cocaine in February 2022 through a urine screen. Mother's case plan identified substance abuse as a concern since September 2020, but Mother did not engage in substance abuse services until November 2021.[3] In other words, Mother did not agree to engage in substance abuse services until after the agency moved for permanent custody of V.F.

{¶ 57} Even knowing that the agency was asking for permanent custody of V.F. based in part on these substance abuse concerns, Mother could not successfully

---

[3] Agency social worker Phillips responded "no" when agency counsel asked if any substance abuse concerns persisted while Mother was not engaged in any treatment. It is not clear that Phillips understood the question asked. But in any event, the remainder of Phillips's testimony and her sworn statements in support of the complaint and in support of the motion for permanent custody (filed in June and September 2021, respectively) make clear that substance abuse has been a concern for Mother since September 2020.

complete outpatient services and tested positive for cocaine again in the first days of February 2022. This relapse corresponded with Mother declining to visit V.F. and losing contact with the agency, which was trying to reach Mother about the case plan.

{¶ 58} While Mother did enter inpatient drug treatment in March 2022 — within a few weeks of this positive drug screen — she did not seek such severe treatment voluntarily; a court ordered her to complete this treatment in connection with a criminal case. There may have been reason to *hope* that this treatment would be effective for Mother, starting her on the path to more permanent sobriety, but there was sufficient competent evidence in the record for the juvenile court to find by clear and convincing evidence that Mother's chemical dependency was so severe that she was unable to provide an adequate, permanent home for V.F. at the present time and was not anticipated to be able to do so within a year of the trial, and moreover that Mother had failed continuously and repeatedly to substantially remedy the conditions causing V.F. to be placed outside the home. R.C. 2151.414(E)(1), (E)(2).

{¶ 59} As for visitation, even when V.F. was staying with a maternal great aunt and Mother had an open visitation schedule — in the first months of V.F.'s life — Mother only visited V.F. "sporadically." From the time the agency placed V.F. into foster care in January 2021, the agency social worker testified that she observed no bond between Mother and V.F. during visits. Perhaps more concerningly, Mother

only visited V.F. twice while he has been in foster care despite the agency counseling Mother on the importance of visitation and establishing a bond.

{¶ 60} It is true that a court involuntarily ordered Mother into Northcoast Behavioral Healthcare from May 2021 through September 2021. But the agency social worker testified that Mother was not in contact with the agency before that commitment — from January through May 2021 — for a visitation schedule to even be established. And after Northcoast discharged Mother in September 2021, Mother only visited V.F. twice despite having weekly visitation opportunities. Between those two visits, Mother missed several scheduled visits. Mother was not able to visit V.F. even though she was finally engaged in both mental health and substance use services, and even knowing that the agency had asked for permanent custody of V.F. When the agency tried to schedule a visitation with Mother for the end of January 2022, Mother declined. This decision not to visit V.F. corresponded with Mother testing positive for cocaine again and falling out of contact with the agency.

{¶ 61} Even accepting Mother's argument that she was physically unable to visit V.F. while she was at Northcoast, there was sufficient competent evidence in the record for the juvenile court to find by clear and convincing evidence that Mother has neglected V.F. and demonstrated a lack of commitment toward V.F. between the filing of the original complaint and the date of the filing of the motion for permanent custody by failing to regularly visit or communicate with V.F. when able to do so. R.C. 2151.414(E)(3)–(4).

{¶ 62} Having affirmed the juvenile court's findings that each of R.C. 2151.414(E)(1)–(4) apply in this case, we need not go through the juvenile court's other R.C. 2151.414(E) findings in detail. Any one of these factors, having been found by clear and convincing evidence, required a finding that V.F. could not be placed with Mother within a reasonable time or should not be placed with her. R.C. 2151.414(E).

### C. Whether Granting Permanent Custody to CCDCFS Was in V.F.'s Best Interest

{¶ 63} The best-interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59. In determining whether permanent custody is in the best interest of the child, a juvenile court must consider "all relevant factors," including, but not limited to, the following:

> the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> the custodial history of the child;

> the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency and

> whether any of the situations set forth in R.C. 2151.414(E)(7)–(11) apply.

R.C. 2151.414(D)(1)(a)–(e).

{¶ 64} The juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), but no one factor is to be given greater weight than the others.

*In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schafer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Further, only one of the factors set forth in R.C. 2151.414(D)(1) need be resolved in favor of permanent custody to support a finding that permanent custody is in a child's best interest and to terminate parental rights. *In re J.C.-A.*, 8th Dist. Cuyahoga No. 109480, 2020-Ohio-5336, ¶ 80; *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.* at ¶ 53.

{¶ 65} The juvenile court has considerable discretion in weighing the R.C. 2151.414(D)(1) factors. We review a juvenile court's determination of a child's best interest for abuse of discretion. *In re P.B.*, 8th Dist. Cuyahoga Nos. 109518 and 109519, 2020-Ohio-4471, ¶ 76, citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47; *see also In re J.B.*, 2013-Ohio-1704, at ¶ 97 ("[T]he discretion that a trial court has in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.").

{¶ 66} Here, the juvenile court found by clear and convincing evidence that a grant of permanent custody of V.F. to CCDCFS was in V.F.'s best interest.

{¶ 67} Mother challenges this finding, arguing that she was working on services to address the agency's mental health and substance abuse concerns and that her court-ordered treatment limited her ability to visit V.F. As for her mental health, Mother points out that she was in a mental health facility under court order from May to September 2021, and then she was engaged in services through

Brighter Tomorrow until the time of the trial. As for substance abuse, Mother points out that she voluntarily admitted a relapse in November 2021 and then she was engaged in outpatient services from November 2021 to February 2022. Mother points out that she participated in drug screens and, at the time of the trial, was in court-ordered inpatient drug treatment.

{¶ 68} The agency presented substantial, credible evidence that Mother has not been willing or able to visit, communicate with or even ask about the well-being of V.F. for substantial portions of his life. When the agency moved V.F. from a relative's home into foster care in January 2021, the agency could not even reach Mother to establish a visitation schedule with V.F. After her discharge from Northcoast, Mother seems to have re-engaged with the agency somewhat, starting to engage with mental health and substance abuse services. But even knowing that the agency was seeking permanent custody of V.F., Mother was only willing or able to visit V.F. twice. She specifically declined to visit with V.F. at the end of January 2022, citing exhaustion. And when she would call the agency about V.F. between October 2021 and January 2022, she would ask about the logistics of the visits but would not ask about how V.F. was doing. Mother again fell out of contact with the agency after January 2022, despite the agency's attempts to reach her. Mother has also seemingly continued to struggle with cocaine and her positive drug screen seems to have corresponded in time with her declining to visit V.F. and falling out of contact with the agency. It is commendable that Mother remained engaged in mental health services from November 2021 through the date of the trial. But even

these services combined with her outpatient substance use services twice a week did not help Mother routinely visit, communicate with, or ask about the well-being of V.F.

{¶ 69} Mother's falling completely out of touch with the agency so close to the trial in this matter — and testing positive for cocaine around the same time — is especially concerning. If Mother had a genuine affection for V.F. and a sincere desire to parent him, then it is clear that something substantial was preventing her from visiting him and engaging with the agency consistently. Based on the evidence in the record, it was more than reasonable to conclude that Mother's mental health and substance abuse issues were the reasons for Mother's disengagement.

{¶ 70} Mother's inpatient drug treatment may end up being a turning point for Mother. But the mere existence of that possibility — in light of all the relevant evidence — does not foreclose a finding that granting the motion is in V.F.'s best interest. Indeed, Mother's argument centers around Mother, not V.F., which is the wrong focus.

{¶ 71} Focusing on V.F., we note that he had been in CCDCFS custody for nearly 18 months at the time of the trial — all of V.F.'s life. He had spent nearly 14 months — more than half his life — with the same foster family. The record reflects, and Mother does not challenge, that V.F.'s foster parents and foster siblings have seen to his physical and medical needs, developed a bond with him to the point that V.F. "clings" to them and seen to his mental and emotional enrichment as well. Moreover, this family is willing to adopt V.F. if the agency were to obtain legally

secure permanent custody of him. V.F.'s guardian ad litem testified that V.F. has "thrived" in their home and is "doing wonderfully." She reported that she believed it was in V.F.'s best interest to have permanent custody granted to the agency.

{¶ 72} In light of all the relevant factors and evidence, the juvenile court did not abuse its discretion in finding by clear and convincing evidence that granting the agency permanent custody was in V.F.'s best interest.

{¶ 73} Following a thorough review of the record and a consideration of Mother's appellate arguments, we conclude that the juvenile court's findings that (1) V.F. could not be placed with Mother within a reasonable time or should be not placed with her and (2) a grant of permanent custody to the agency, not an extension of temporary custody, would be in V.F.'s best interest are supported by clear and convincing evidence and are not against the manifest weight of the evidence. Accordingly, Mother's assignment of error is overruled.

## III. Conclusion

{¶ 74} Having overruled Mother's sole assignment of error, we affirm the juvenile court's grant of permanent custody of V.F. to the Cuyahoga County Division of Children and Family Services.

It is ordered that the appellee recover from the appellant the costs herein taxed.

The court finds that there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
EMANUELLA D. GROVES, J., CONCUR